The court Brian Barnes for the plaintiff's appellants in granting the motion to dismiss the district court weighed evidence, made credibility determinations, and drew factual inferences in the defendant's favor. This was error. Neither the district court nor this court has the authority to impose a heightened pleading standard for presidential removal claims, and under Rule 8's liberal pleading standard, The allegations in the complaint are more than enough to survive a motion to dismiss. Now the Trump administration's stated policy objective with respect to Fannie Mae and Freddie Mac was to end the conservatorships as promptly as practicable. We've documented that in statement after statement in paragraph 53 of the complaint, where the Trump administration officials say over and over again that that was the policy of the administration. And the critical point is that there was no way for the Trump administration to accomplish that policy objective without in some way getting rid of this liquidation preference. And let me- You don't have any direct statement from the president until after he had left office. Isn't that right? That's true, Your Honor. I don't have a direct statement from the president himself. I do have a couple of things I would point to, though, from officials who the president appointed. So first we've got the Treasury Department's September 2019 report that specifically contemplates the elimination of the liquidation preference, either by writing it down or by converting Treasury's senior preferred stock. Okay, but your pleading was about the conservatorships, not the liquidation preferences. That's true, Your Honor. So I don't have a statement from the- Well, I think the White House in April of 2019 issued a directive that contemplated getting these companies out of conservatorship. I'll acknowledge that that White House document doesn't specifically address getting rid of the liquidation preference, but the key point here is that there's no way to get these companies out of conservatorship quickly, as the Trump administration's policy dictated, without getting rid of that liquidation preference. And the reason why is because the companies had a huge capital shortfall as a result of paying enormous sums to the Treasury Department under the Third Amendment, and the companies could not be responsibly released from conservatorship without raising substantial new capital in order to fill that capital deficit. The only way to raise the capital that the companies needed on the timeline that the Trump administration contemplated was by changing the capital structure in a way that would make the newly issued stock attractive to investors. No one's going to put more money into Fannie and Freddie when the Treasury Department has this enormous liquidation preference that makes it impossible for anyone other than the Treasury Department. The government points, if that were even true, inexorably, which seems to be the logic, as opposed to pointing to evidence saying that's true, it's just you're saying economically it would have to have been that way, we still have direct evidence that Dr. Calabria, who had no removal restriction, in 2019 and 2021 increased the liquidation preference. He did increase the liquidation preference. So how could that possibly be consistent with your nexus to show that the President wanted to do the opposite and only didn't because of the restriction on Dr. Watt's removal? So a couple of points on that, Your Honor. First, the increase to the liquidation preference during those interim periods while Director Calabria was in office, those preserved optionality for the Trump administration. So I will readily concede that it wasn't clear precisely how the Trump administration would have ultimately gotten rid of the liquidation preference. So we know that they had to get rid of it somehow just because of the economic logic of the situation, but it wasn't clear whether they would eliminate the liquidation preference by writing it down to zero or by converting Treasury's senior preferred stock into common stock. And if they opted for a conversion, then all things else being equal, a larger liquidation preference would have resulted in a larger amount of common stock for the Treasury Department. And so it made sense while they were still sort of working through with their financial advisors like what the most effective and appropriate way was of getting rid of the liquidation preference, that they, in the interim, would increase the liquidation preference to just preserve that optionality of, as the Trump letter says, trying to maximize the government's return. But our focus has to be on the unconstitutional four-clause restriction. And that only restricted Dr. Watt's behavior. I'm sorry, Your Honor. Isn't that right? And then we've got to show, as you told the district court and then you told us again in the briefing, the third element of the retrospective harm test is, but for being thwarted by the removal restriction, this specific action benefiting your clients would have occurred, the government giving up its ownership position, preference. Is that right? I think that's right. And you're saying it's because of, it's just the only way they could have privatized. That's right. If the administration had another two years, they would have been able to carry out this ultimate plan of recapitalizing the companies and releasing them from conservatorship. And just as a matter of fundamental economic logic and the reality of these financial markets, there's no way to accomplish that without getting rid of this liquidation preference. Well, counsel, you take issue with the adoption of the phrase concrete plan, which was not a Supreme Court term. It seems to me what we're discussing now shows potentially the validity of that focus. You're indicating you're not sure how this could have been done. I don't want to mischaracterize what you're saying, but it does seem to me when we're actual injury resulting from not being able to remove the director, there needs to be an allegation, a plausible allegation that it was, this is how this could have occurred. And there was interest shown by the listing in paragraph 53 and wherever else it is, that that actually was on the table. Respectfully, Your Honor, if you look at the prayer for relief in our complaint, we don't ask for an injunction that directs the defendants to eliminate the liquidation preference in any particular way. And so the one thing we know is that if the Trump administration had been able to carry out and accomplish the ultimate goal that it had, which was to get these companies out of conservatorship, that liquidation preference one way or another had to go away. We're not asking this court or ultimately the district court on remand after factual development to specifically direct the defendants to eliminate the preference. But you're asking us to hold that you have pled enough to show that but for, all of this would have been implemented. And here's, and I think that's where the idea of a concrete plan comes into play, that we're still talking around that perhaps it could have been done, but unless the administration, unless you can show in your pleading that the administration actually had some way to achieve that, but for the two years that they were hamstrung by not being able to remove the director, absent some sort of plausible allegations like that, you have a ways to convince me. Well, they, they clearly had some, more than one way to achieve getting rid of the liquidation preference. And, you know, it may be useful to, to, to point to Justice Kagan's concurring opinion in this case and where she talks about the need to put plaintiffs who have been harmed by unconstitutional removal protections into the position they would have been in absent the constitutional violation. And Justice Kagan specifically cites to a case from the 1970s from the Supreme Court about racial desegregation. And in that case, what the Supreme Court had done was it had upheld this restorative injunction that it didn't just prohibit de jure segregation going forward. It ordered basically the, the, the city of Detroit and the state of Michigan to undertake efforts to put the victims of this constitutional violation into the position that they would have been had there not been a constitutional violation. And Kagan, she looked at this exact situation and said, don't even need to remand because treasury, correct me if I'm wrong. Treasury is the one that has the preferences. Treasury had no removal restriction, so treasury didn't unilaterally dump them, nor did they even commence negotiations with the director. So, so there you'd get absolutely, you'd have a complete block. You wouldn't even be on remand if you take her logic, correct? I don't think that's right, Your Honor. Justice Kagan joined the majority opinion, the remedial discussion in the majority opinion, so I think she did. But didn't she say just what I've described? Didn't she point out that ultimately here, it's treasury that has the preference and treasury has no Article II infringement, but they didn't dump the stock? Well, the, the focus of Justice Kagan's, uh, Am I right about that observation? You're correct about that. And what's your response to that? Yeah, so, so my response to that is that the focus of Justice Kagan's discussion there is on the initial adoption of the Third Amendment as opposed to the subsequent possibility of a renegotiation between Treasury and FHFA. The PSBAs can't be unilaterally amended by the Treasury Department, but even put that to one side, and it's important to recognize that in a lot of ways, uh, our position is not that the Trump administration saw getting rid of the liquidation preference as an end in and of itself. In other words, it, it's not surprising that the Treasury Department didn't, or wouldn't have wanted on our understanding of the, of the policy of the Trump administration to just get rid of the, the liquidation preference in exchange for nothing. Our point is that that's a necessary step in the accomplishment of a broader policy aim, uh, that the Trump administration, if they'd had an additional two years of control of FHFA, that the Treasury Department and FHFA ultimately would have been able to accomplish. Let me, let me tease it out just a little bit more because it appears not only in Justice Judge Haynes' own remand, uh, where she didn't think it had to be sent back to the District Court, really relying on the control of the President over Treasury. Uh, I'm not sure how that would work, but it seems to me the argument is, at least as Judge Higginson put it, that there's no allegation of negotiations having started by Treasury, whose, whose authority the President had, certainly. But you raised the point, and I, I wondered about the, I didn't join, uh, Justice, Judge Higginson's opinion, because it does seem to me that what you're talking about is a bilateral agreement, uh, that you would need approval of both. I guess if this is really a question for your friends on, at that other table of how that would have worked. But your answer to why, uh, Judge Haynes was wrong, why this need, need, need, did need, why was she wrong that Treasury itself isn't the answer to why you were not injured? So, so there are two answers, Your Honor. The first is that it is a, a bilateral agreement, as, as Your Honor points out. And the second is that, uh, the Trump administration, through its control of Treasury, could not unilaterally accomplish this ultimate end of getting Fannie and Freddie out of conservatorship. So this is a sequential process that the administration had to go through. Number one, you've got to amend the, the preferred stock purchase agreement so that the companies can begin to retain and build capital. Number two, the FHFA, which is the, the agency with the relevant statutory authority, has got to issue a, a capital rule that specifies how much capital these companies need because you can't do a capital raise until you know how much money needs to be raised through that capital raise. And then number three, you've got to have Fannie and Freddie develop a plan for how they're going to restructure their, their capital structures so as to accomplish the goals of the Trump administration of raising the necessary capital while also maximizing the return for Treasury. These are things that the FHFA has to do, and it makes imminent sense, given all of the policy disagreements that we document in the complaint between Director Watt on the one hand and the Trump administration on the other, that officials in the White House determined that this was not a process that they could reasonably undertake while Director Watt was the director of FHFA. And so, uh, again, this is a, this is a multi-step sequential process that the Trump administration had to undertake. It's not enough to just look in isolation at the elimination of the liquidation preference because we're, we're not alleging that that was the ultimate goal of the Trump administration. What we're saying is that that is something that the, the administration had to do in order to, uh, accomplish its, its ultimate goals. Um, I, I do want to say a word if I could about our appropriations clause claim. Um, the claim is properly before the court. We were permitted to amend the complaint on remand to add that claim. This court's cases... Right, but that doesn't comply with the Band-Aid rule. It doesn't. The Supreme Court was pretty specific about what it told the lower courts to do. Well, and I, I would point this court to, um, it's a, a case we cite in our, our reply brief. The, um, the, I'm sorry, the, the Jones against St. Paul Fire Insurance Co. case where, uh, it's essentially what happened here happened in that case where the case comes up to the circuit. Um, the, this court remands the case for further proceedings. The district court permits the plaintiff to amend its complaint, to add a claim, and then the case, case comes back up, and this court said that that was, uh, uh, an appropriate, it was consistent with the Mandate Rule. So there, the, the, the office of the Mandate Rule is to prevent re-litigation. This court's been very clear. It's about preventing re-litigation of issues that have been litigated previously, and there's no allegation on the other side that, that this Appropriations Clause issue came up during the earlier appeal. Um, and, you know, there, there might have been a waiver argument that the other side could have made or an argument against us being permitted to amend the complaint to add this claim, but once the claim was in the amended complaint and the other side hadn't objected to that amendment, at that point, it's properly a part of the case and it, it, it, it's, the merits of that claim are, are properly before the court. All right. Thank you, Mr. Barnes. You've saved time for rebuttal. Mr. Katerberg. Good morning, and may it please the court. I'm Rob Katerberg for FHFA, FLEs. I'm going to go first and then Mr. Sinsdack will speak on behalf of Treasury. The relief plaintiffs are seeking here is extreme in nature. Legally unavailable and based on a speculative theory that's outside the bounds of plausibility and it's not what the Supreme Court remanded for. Judge Southwick, I'd like to start by addressing the question that you posed about Justice Kagan's, um, concurring opinion and Judge Haynes' dissent, um, on the remand. Um, the point that Treasury is the owner of these preferred stock interests very much plays into the implausibility of the plaintiff's theory because it's completely implausible that if the President wanted these interests gone, uh, why that would not show up anywhere in Treasury's agenda for what it was trying to accomplish. Um, we have— Is that the point? They may not have been able to achieve it, but there's no allegation they were trying to negotiate anything? That, that's absolutely right, Your Honor, and it is, it is true, as my friend says, that the specific point that Justice Kagan was making was about the adoption of the Third Amendment in the first instance, and they've changed their theory considerably since then because the liquidation preference is, that, that issue is totally different from the Third Amendment, which pertained to the dividends, but the rationale, the reasoning of Justice Kagan's opinion applies equally to this situation. I'd also like to clear up a couple points that I heard repeatedly from my friend on the other side. Uh, the, the, there are a number of references in the record in the 2017-2018 timeframe to exit from conservatorship being a goal. Um, that's been a goal, uh, uh, ever since practically the beginning of the conservatorships because everybody believes on both sides of the aisle, all the policy makers, that conservatorship is not intended to be an end state, but here's the critical thing, that cannot be conflated with wiping out the liquidation preferences, and I'm going to point you to something very specific in the record that will demonstrate that, and it's page 26 of Treasury's September 2019 Reform Plan, it's page 1292 of the record. This is a detailed report by President Trump's, uh, Treasury Department, and it's a section that says preconditions for ending the conservatorship. It lists a number of things, there's six detailed bullets. Those bullets presuppose the continued existence of the preferred stock purchase agreements and the preferred stock, uh, after, uh, conservatorship was to end. There's, there's two bullets in particular that refer specifically to the PSPAs. But you're saying there's no ... I didn't quite catch, where is that, what are you quoting from or pointing us to? Uh, yes, Judge Southwick, that's page 1292 of the record, and this is page 26 of a, of a September 2019 Treasury Housing Finance Reform Report. Excuse me, Chief. Well, it was related to that, it was just that you're saying that the, well, does the case, is the case that articulates the three-part test to determine retrospective harm? Absolutely, Your Honor. Okay, and therefore, and so you're primarily focusing, I think, on the third, correct? Right now? That's, that's right. I, I think they have some issues, one and two, but the three is really, prong three is really where the action is. And you're saying when he says it's inexorable, it's inevitable, it's just economic inevitability that if there are statements showing a desire to privatize, the only way to do it would be the liquid private, and that's what you just said the record conflicts with that. Is that fair to say? That, that's exactly right. The record shows that, that it was very much contemplated that the conservatorships could end, yet the liquidation preferences persist. Another thing that he said repeatedly, I think I must have heard this a half a dozen times, is that you would need to eliminate the liquidation preferences in their entirety as a necessary condition precedent to having a stock offering. That is not the case either, Your Honors, and we know that because there is a provision built into the preferred stock purchase agreements that was retained in the Trump amendments to the PSPAs in September 2019 and again in January 2021 that says that at least part of the proceeds of a stock offering have to be used to pay off the liquidation preferences. Now they changed it a little bit in January 2021. The original form of that said that all of the proceeds, as much as it would take to from a stock offering, had to be used to pay down the liquidation preferences. And then in January 2021, they, they modified it so it was, so they could keep up to $70 billion, but then anything after that would have to be used to pay these down. But that absolutely conflicts with what, what seems like a necessary premise for the argument on the other side, that you would have to wipe these things out in advance. I would also note that the, the same Treasury report I referred to a moment ago, it's actually on the next page, page 1293 of the record. This is the one place in all the documentation that's referred to in the complaint that actually talks about this idea of potentially eliminating the liquidation preferences and what it says is eliminating all or a portion of the liquidation preference or exchanging all or a portion of that interest for, for common stock. So even, even the best it gets for them in the record, it's not talking about having to do all of it and even that, that concept that it could be all or a portion of, it's, it's listed as one of several items on a menu of things that we're all going to require sort of further consideration and further study what, before any of them were actually decided upon and implemented. I also want to talk a little bit about why this whole theory is, goes far beyond what the Supreme Court remanded for. They put them in the position that they would be in but for the unconstitutional removal restriction and that's, that's not what the Supreme Court said. I'm going to be very specific about this. If you've got a copy of the Supreme Court's opinion, you might want to turn to it, page, Section 3C, which is this remedial discussion, starts at pages 1787 and what they say, they say the only remaining remedial question concerns retrospective relief. That's at the end of the first paragraph of 3C. So retrospective relief and then they say on this issue, the shareholder's lead argument is that the Third Amendment must be completely undone. The court went on to reject that argument and they talk about the Third Amendment being adopted and implemented by officers who lacked constitutional authority. They then go on to say, this is in the next paragraph, we therefore consider the shareholder's intention about remedy with respect to only the actions that confirmed directors have taken to implement the Third Amendment during their tenures. Further down in that paragraph in the last sentence, they again talk about actions taken by the FHFA in relation to the Third Amendment. So that, that really draws a perimeter around what the Supreme Court was expecting of this remand. Well, read for us the specific language where the Supreme Court told us why, why, why they were remanding. Yes, Your Honor. So it says, that does not necessarily mean, and that's referring back to the fact that the adoption wasn't ultra vires, that does not necessarily mean that the shareholders have no entitlement to retrospective relief, and I'm going to skip over a little bit of language here. They say it is still possible for an unconstitutional provision to inflict compensable harm. The possibility that the unconstitutional restriction on the President's power to remove a director of the FHFA could have such an effect cannot be ruled out. And then they go through a couple of hypotheticals, uh, contemplating his public safety. You're taking a lot of time. What's your point? We, you're not disputing the test we articulate in CFSA where we say, you know, but for non-removal Richard Cordray, the President would have acted differently. Are you saying? Are you? Well, your test, I think, is completely in sync with one of the points that I'm trying to get across, which is the way it's phrased in CFSA is that it has to relate to an agency action. Here, they're not even, they're not challenging an action of any acting, any director, confirmed director of FHFA in relation to implementing the Third Amendment. Implementing the Third Amendment, they told the Supreme Court this. What they're complaining about by implementation of the Third Amendment had to do with dividends. The idea was the dividends to Treasury under the Third Amendment are higher than the dividends that would be, that would apply absent the Third Amendment, and that's what they're complaining about, and they said, well, we want Treasury to have to repay those amounts. On remand, their theory's shifted entirely. They're no longer talking about dividends. They're instead talking about liquidation preferences, and so it's totally different. It's not within what the Supreme Court described, but whether you look at what the Supreme Court explicated for the remand or this Court's test in CFSA, I think all roads point toward dismissal. So, very briefly, on the approach... Is it necessary for your position for us to accept Keith Ellison's contemporaneousness requirement? I would say, I don't think he applied a strict contemporaneous requirement. I mean, I think the problems here go beyond the lack of contemporaneity. The problem is that the things that the former president said in his letter are completely inconsistent with what actually happened when he had plenary power over both of the agencies. Briefly as to the... Do you agree with the contemporaneous requirement? We think the lack of the, the fact that it wasn't contemporaneous, the fact that there are no statements at the relevant time, certainly detracts from the plausibility of... That's one of the fact-finding concerns that we heard, or at least it's in the briefing, that the district judge may have given lesser weight. We're not supposed to weigh things in a motion to dismiss, so you seem to be going that way a little bit as well. Well, I don't, I don't think so, Your Honor. So, I mean, the problems with the reliance of the letter are manifold. For one thing, you can tell from the way it starts out that it's not going to be on point because it asks what, what would he, he says the question the Supreme Court has raised is about what I would have been able to accomplish. With respect, it's not about what he would have been able to accomplish, it's whether particular actions by Director Watt implementing the Third Amendment would have been different. You know, it was made after he had left the presidency, four to five years after the relevant events, and it goes into a series of disconnected statements that don't even mention the liquidation preferences, and as I mentioned earlier, my friend on the other side, this notion that it's inexorable, that you'd have to get rid of the liquidation preferences in advance, it's not borne out by the actual facts in the record and all the things that they've pleaded in the complaint. All right, thank you, Mr. Atterberg. Mr. Sinsack? Thank you, Your Honor. I may please the Court, Jerry Sinsack, appearing on behalf of the Treasury Department. With respect to the Plaintiff's removal authority claim, I think the most straightforward way to dispose of that claim is the way this Court did in its initial remedial opinion in the En Bond case from 2019. I think, again, plaintiffs here are arguing that if not for the removal restriction, the President would have dramatically reduced Treasury's interest in these enterprises. As this Court noted then, as Judge Hoyt Haines noted on dissent more recently, the President controlled Treasury's interests at all times and could have directed Secretary Mnuchin to eliminate that interest or dramatically reduce it, or at a minimum, to begin negotiations with FHFA to reduce it, and he did not do so. Obviously, plaintiffs also do not allege that Secretary Watt would have objected. That's another basis to it. There's no reason, plausibly or logically, he would have done so, and certainly there's no reason to think that his own chosen director would have objected to doing that. So the fact that the President controlled Treasury's interests at all times is sufficient to defeat plaintiffs' claim for their particular injury. I think, as this Court also noted in its remedial holding and has come up already, that there's an inconsistency with the actions actually taken by the chosen director, FHFA Director Calabria, after he was appointed. So you're happy to concede that even Watt, a regulator appointed by the opposing party, would have wanted to have eventually privatized and gotten out of this business, but it doesn't lead to the suggestion that, but for his removal clause, the President would have implemented that. Well, in terms of, I mean, I guess there's a few points there. I mean, if what President Trump wanted to do was dramatically reduce the liquidation preference, whatever his ultimate goal was, Director Watt would have been overjoyed, I'm sure, to do that, because that would have freed the enterprises of this obligation that they owed to Treasury at no cost to the enterprises, and plaintiffs don't, at any point, suggest he would have objected to that, and there's no logical reason why he would have. So, and he did many of the steps, as we point out in our brief, that Director Calabria did. He negotiated an increase in working capital for the enterprises. He worked on regulatory reform. He did a number of these things. The plaintiffs don't claim, or argue plausibly, or argue at all that he would have objected to any of these steps, so even if you thought that the FHFA Director's approval was required in order to eliminate Treasury's interests, there's no reason to believe Watt would have objected to that, and certainly no reason to believe that his chosen Director would have objected to that, and in fact, the chosen Director, as this Court pointed out, did the opposite. And as the District Court also found, I mean, it goes beyond this, the idea that President Obama's new plan of eliminating the liquidation preference isn't supported by the allegations that plaintiffs have made, and is also not supported by the letter, even. Even if you take that letter at face value, don't worry about the contemporaneous points. That letter says it would have sold Treasury stock at a massive profit. That's not consistent with sort of gratuitously giving away their liquidation preference during his term. So, there are many flaws, I think this Court has already identified them, again, in its en banc opinion, and can rely on either of those reasons, or the reasons given by the District Court, to reject the claim. If Your Honors have no further questions on that, or others, I'm happy to... Thank you, Mr. Sinclair. Mr. Orange for a vote. Thank you, Your Honor. I just heard reference to the suggestion that our view is that the government would have gratuitously given away Treasury's stake, and that's what we think the Trump policy was. That's just a complete straw man misrepresentation of what we're arguing. What we're saying is that as a matter of fundamental economic logic, and the reality of these financial markets, the only way for these companies to raise capital is to get rid of that liquidation preference. That would have been a step in the direction of monetizing the government's interest, selling off the government's interest in these companies, not in gratuitously giving away the government's interest. I also want to emphasize that we're here on a motion to dismiss. We have a District Court ruling that discounts the credibility of the Trump letter, and, you know, it's fine for people to have skepticism about whether what President Trump says in that letter is right or wrong, but a motion to dismiss is not the right vehicle for weighing the credibility of evidence, and that's essentially what the District Court did in dismissing our claim. Well, but it would be a matter of law one way or the other as to whether a letter that comes after the President has left office can even be considered. That's not a fact finding. That would be a point of law. I don't disagree with that, Your Honor, but it's important to keep in mind this isn't a totally unique inquiry in the law where we have to construct, you know, a hypothetical world or ask but for the legal violation, what would have happened? And there's no contemporaneousness requirement in other areas of the law where this comes up. I mean, you could think about the antitrust context where you have to ask, well, in the but for world where there wasn't anti-competitive behavior, you know, what would the markets have looked like? We wouldn't in that context say, well, we're only going to look at the specific, you know, evidence that was created at the time of the anti-competitive conduct and we'll blind ourselves to testimony after the fact by somebody who says, I would have done this or I would have done that if the market had been structured differently. So too, like a school desegregation case, you wouldn't say, well, we're going to only look narrowly at the evidence of, you know, the events as they took place while the schools were segregated and we're not going to ask based on, you know, our common sense and whatever other evidence is out there, what would have happened if there hadn't been segregation and what educational levels would the victims of the segregation have attained? So this is just not something that we see in other areas of law where this type of task has to be undertaken by courts. He didn't really rest as far as I could hear. I didn't hear either the government saying, well, discount the letter altogether. They're just saying the phrase make great profits doesn't get you across the finish line as to the specific action you wanted, your plaintiffs. That's what I heard. And to be clear, President Trump said that he would have made great profits by selling the company's common stock. That stock is worthless as a fundamental matter of economics so long as this liquidation preference is there. Let me also say as to the idea of a concrete plan, there was a concrete plan to get these companies out of conservatorship. There wasn't, they hadn't worked out the details of the mechanism ultimately that they would use to eliminate the liquidation preference, but they amended the preferred stock purchase agreements under Director Calabria so the companies could build capital. They adopted a capital rule to clarify how much capital the companies needed and they restructured the company's capital structure so that they could exit, raise third party capital and exit conservatorship. So there were concrete, actual steps that the Trump administration took in furtherance of this stated policy objective. And so I think that's enough to get us where we need to be, especially on a motion to dismiss. Counsel for FHFA made a couple of references to the Treasury Department's report from August of 2019. A couple of points on that. First, I think Mr. Katerberg conflated the concept of the continued existence of the PSPAs with the concept of the liquidation preference still being out there and still being hundreds of billions of dollars. And those are two separate things. So we're not asking the court to throw out the preferred stock purchase agreements in their entirety. All we're saying is that those liquidation preferences had to be eliminated in order for the Trump administration to get where it wanted to go. Mr. Katerberg also quoted from a passage in that report that refers to all or a portion of the liquidation preference being written off. And what the Treasury Department was getting at there is you could do a combination of some write off of the liquidation preference and some effort to convert a portion of Treasury's senior preferred stock into common stock. And so for all those reasons and because we're here on a motion to dismiss, I just urge the court to reverse. So if we were, of course we'll decide what to do, but if we were to remand to the district court, what is the ultimate result that you would have the district court arrive at in the case? So the prayer for relief in the complaint asks for an injunction that directs the defendants to basically get rid of the liquidation preference either by converting Treasury's senior preferred stock into common stock or else by writing off the liquidation preference. We think one of those two things is what would have happened had the Trump administration controlled FHFA for the entirety of the four years of the administration. But you know, of course the specifics of what the remedy should look like may ultimately depend on the facts that would be developed on remand. You know, and we're here on a motion to dismiss and I think the pleaded relief is clearly what we're entitled to if we can prove the facts we've alleged. All right. Thank you, Mr. Barnes. Your case is under submission. Last case for today, Johnson v. Harris County.